IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND

LAMONT DEMBY,                              *

      Plaintiff,                          *

v.                                        *    Case No. 03-00385 CCB

KENT COUNTY, MARYLAND, et al.,            *

      Defendants.                         *

    *    *    *    *    *    *    *

**MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS,
OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT**

Kent County, Maryland, Chestertown, Maryland, the Chestertown Police Department,

and, in their personal and official capacities, Sergeant C.F. Wode and Officer Jason Yiannakis,

Defendants, by their undersigned counsel, pursuant to Local Rule 105.1, submit this

Memorandum in support of their Motion to Dismiss, or, alternatively, for summary judgment.

**I.      Introduction**

On February 11, 2003, Plaintiff Lamont Demby ("Demby"), through counsel, filed his

Complaint in the United States District Court.  The Complaint, brought under the auspices of 42

U.S.C. § 1983, named Kent County, Maryland, and Town of Chestertown Police Officers C. F.

Wode and Jason Yiannakis, as Defendants, and, in addition to one claim of Federal Civil Rights

Violation (Count IX), pled seven supplemental causes of action:  False Imprisonment (Count I),

Defamation Per Se (Count II), Assault/Battery (Count III), Intentional Infliction of Emotional

distress (Count IV), Negligent Supervision (Count VI) (sic), Malicious Prosecution (Count VII),

and State Constitutional Violation (Count VIII).  All claims arose from Demby's arrest on

August 30, 2001, during which he alleges that excessive force was used against him. Summonses were issued for Defendants on February 12, 2003.

Despite the issuance of summonses, Demby failed to effect service.  Consequently, on June 23, 2003, the Court issued an Order requiring Plaintiff to show good cause as to why his complaint should not be dismissed, without prejudice, pursuant to Rule 4(m), Federal Rules of Civil Procedure and Local Rule 103.8.a.  On July 8, 2003, Demby's counsel responded, offering the excuse that he "mistaken[ly] neglected to serve the Defendants in this matter."  Pursuant to Order dated July 9, 2003, the Court permitted the action to proceed without dismissal, requested the Clerk to re-issue summonses, and directed Plaintiff to served Defendants within thirty (30) days of the re-issuance.  Summonses were re-issued on the same date.

By July 14, Officer Yiannakis and the Kent County Attorney had been served.  And, despite Demby's, or his counsel's, seeming inability to differentiate between Kent County and the Town of Chestertown (the summons for the Town was served upon the County Attorney), all Defendants with the exception of Sergeant Wode have now received copies of the original Complaint.

On July 17, 2003, Demby, subsequent to discovering the difference between the local governments, moved to leave to amend, or correct, his pleading.  His proposed Amended Complaint, which was attached to this motion as an exhibit, adds Chestertown, Maryland, and the Chestertown Police Departments as Defendants.  Defendants now respond to both the original and amended Complaints.

**II.    Motions to Dismiss and for Summary Judgment**

The objective of Rule 12 of the Federal Rules of Civil Procedure is to expedite and

simplify the pretrial phase of federal litigation while at the same time promoting the just

disposition of cases.  Charles Alan Wright and Arthur R. Miller, *Federal Practice and*

*Procedure*: Civil 2d § 1342, at 161.  The purpose of Rule 12(b) is to promote the expeditious

and simultaneous presentation of defenses and objections.  *Id.* § 1347, at 183.  Specifically, a

motion to dismiss for failure to state a claim under Rule 12(b)(6) challenges a plaintiff's right to

any recovery under the well-pleaded facts in his or her pleading.  *Id.* § 1355, at 291-92.  The

purpose of such motion is to test the formal sufficiency of the statement of the claim for relief; it

is not a procedure for resolving a contest about the facts or the merits of the case.  *Id.* § 1356, at

294; *see also Spell v. McDaniel*, 591 F. Supp. 1090, 1099 n.1 (E.D.N.C. 1984), *aff'd in part,*

*vacated and remanded in part*, 824 F.2d 1380 (4th Cir. 1987), *cert. denied sub nom. City of*

*Fayetteville v. Spell*, 484 U.S. 1027 (1988).  Thus, as opposed to a summary judgment motion,

on a motion under Rule 12(b)(6), the court's inquiry essentially is limited to the content of the

complaint.  The distinction between the two motions is not substantial, however, because Rule

12(b)(6) provides that if "matters outside the pleading are presented to and not excluded by the

court, the motion shall be treated as one for summary judgment."  Wright and Miller, *supra*,

§ 1356, at 299 (quoting Fed. R. Civ. P. 12(b)(6)).

"Summary judgment is a tool to winnow out from the trial calendar those cases whose

facts predestine them to result in a directed verdict."  *United Nat'l Ins. Co. v. The Tunnel, Inc.,*

988 F.2d 351, 355 (2d Cir. 1993).  A court may grant summary judgment only if the evidence,

viewed in the light most favorable to the party opposing the motion, presents no genuine issue of

material fact, and the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). However, if "the evidence [is] so one-sided that one party must prevail as a matter of law," the court must grant summary judgment in that party's favor. *Id.* at 268. The Court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion. *City of Yonkers v. Otis Elevator Co.,* 844 F.2d 42, 45 (2d Cir. 1988). If there is evidence in the record concerning any material fact from which an inference could be drawn in favor of the nonmovant, summary judgment will be denied. *Holt v. KMI-Continental, Inc.,* 95 F.3d 123, 128 (2d Cir. 1996). This is because the Court is charged with "issue finding," not "issue resolution." *Gallo v. Prudential Residential Servs., Ltd., P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

Once a party moves for summary judgment, the nonmovant must come forward with specific, material facts showing the existence of a genuine issue for trial. Fed. R. Civ. P. 56(e); *West-Fair Elec. Contractors v. Aetna Cas. & Surety Co.,* 78 F.3d 61, 63 (2d Cir. 1996). A genuine issue of material fact exists if "a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 249. However, mere conclusory allegations, speculation or conjecture will not avail a party that resists summary judgment. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996); *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

Proper application of these principles to the record here requires that the instant action be dismissed, with prejudice, or, alternatively, that judgment be entered in favor of Defendants.

### III.    Material Facts Not Genuinely in Dispute

On August 30, 2001, at approximately 11:55 p.m., Sergeant C. F. Wode ("Sgt. Wode") of the Chestertown Police Department was on patrol near the intersections of Washington and

4

Gibson Avenues in Chestertown, Maryland.  (Exhibit 1.)  He observed Demby driving a maroon, four-door, Mazda sedan, bearing Maryland Registration Plate NDD 512, into the Royal Farms Store parking lot off Maple Avenue.  (Exhibit 1.)  Because he had previously conducted a criminal investigation of Demby in October 2000, which concerned, in part, possession of narcotics and narcotic paraphernalia (Exhibit 2), and a subsequent arrest on November 28, 2000, for driving on a suspended license (Exhibit 3), Sgt. Wode suspected that Demby's license was suspended.  (Exhibit 1.)  Consequently, Sgt. Wode circled the block, and radioed the tag number to communications.  (Exhibit 1.)  As he came back towards the parking lot, Sgt. Wode observed that Demby's vehicle was gone.  (Exhibit 1.)  He then proceeded north on Washington Avenue, waiting for a response from communications.  (Exhibit 1.)  When no response came, Sgt. Wode pulled into the lot of the Mobil Gas Station, and used a pay telephone to call police dispatch. (Exhibit 1.)  He was advised by communications that Demby's license was, in fact, suspended, due to numerous failures to appear in court.  (Exhibits 1 and 4.)  Sgt. Wode requested dispatch to "hold" the copy, and headed towards northbound Route 213.  (Exhibit 1.)  As he did so, he again observed Demby's car, this time proceeding past him on northbound Route 213 near Gibson Avenue.  (Exhibit 1.)  Sgt. Wode activated his marked police car's emergency equipment and effected a traffic stop.  (Exhibit 1.)  At approximately three minutes before midnight, Demby pulled his car into the parking lot of Kunkel's Auto Parts and came to a stop.  (Exhibit 1.)  Sgt. Wode followed, calling out the traffic stop on his radio.  (Exhibit 1.)  In response, the dispatcher sent Officer Yiannakis to the scene as back-up.  (Exhibit 1.)

Sgt. Wode exited his police car and approached the driver's side of Demby's car. (Exhibit 1.)  Sgt. Wode informed Demby that he was stopped due to a suspended license.

Demby responded that he "thought that had been taken care of." (Exhibit 1.) Demby continued that he also had problems with the car, specifically a leaky roof and broken sun roof. (Exhibit 1.) Since it had just rained, Sgt. Wode tried to help close the sun roof. (Exhibit 1.) At this point, Officer Yiannakis arrived in his marked patrol car. (Exhibit 1.) Sgt. Wode then directed Demby to exit his car and place both of his hands on the roof. (Exhibit 1.) As he began to exit, Demby slowly removed his left hand from his pants pocket. (Exhibit 1.) As he did so, Sgt. Wode observed that Demby's fist was balled. (Exhibit 1.) Demby then slowly moved his left fist towards the sun roof. (Exhibit 1.) He interrupted the movement, however, by suddenly inserting the clear plastic baggie in his left hand into his mouth. (Exhibit 1.) Seeing this, and suspecting that Demby was ingesting narcotics, Sgt. Wode grabbed Demby and applied a chokehold in an effort to free the baggie. (Exhibit 1.) He repeatedly ordered Demby to "spit it out". (Exhibits 1 and 3.) As he attempted to keep his hold, Sgt. Wode, and Demby, who was struggling to get free, fell to the ground. (Exhibits 1 and 5.) Sgt. Wode called for Officer Yiannakis to assist. (Exhibit 1.) Officer Yiannakis ran over, and also ordered Demby to "spit out" the baggie. (Exhibit 1.) Despite repeated commands to "stop", to put his hands behind his back, and to "spit out" the baggie, Demby continued to chew the baggie and struggle against the officers. (Exhibits 1 and 5.) With his first attempt having failed, Sgt. Wode then struck Demby in the stomach in an effort to knock the wind out of him. (Exhibit 1.) Because Demby was lying on his stomach, this effort also failed. (Exhibit 1.)

Due to Demby's resistance, which included flailing his arms and elbows and tightening his right arm, the officers were unable to handcuff him. (Exhibit 1.) As a result, Sgt. Wode radioed for additional assistance. (Exhibit 1.) Officer Yiannakis then used pepper spray to

terminate Demby's resistance.  (Exhibit 1.)  This tactic also failed, as the spray hit Sgt. Wode,

and Demby continued to flail, squirm, and pull away.  (Exhibit 1.)  Sgt. Wode wanted to use his

ASP baton to control Demby, but, due to the close quarters, and proximity of Officer Yiannakis,

he was unable to do so.  (Exhibit 1.)

As the struggle continued, Officer Yiannakis said that it appeared Demby had swallowed

the baggie.  (Exhibit 1.)  In response, the officers again yelled to Demby to put his hands behind

his back.  (Exhibit 1.)  Sgt. Wode finally forced Demby's hands behind his back and applied his

handcuffs.  (Exhibit 1.)  Within a short period of time, the other units arrived.  (Exhibit 1.)  An

ambulance was also called to the scene, and Demby, Sgt. Wode, and Officer Yiannakis were all

taken to the Kent and Queen Anne's Hospital Emergency Room for treatment, which included

decontamination from the pepper spray.  (Exhibit 1.)  As a result of the occurrence, Demby's

knees were scraped and there was a minor cut on his right hand incurred during the fall to the

street.  (Exhibit 1.)  He also had bitten his tongue, during, as surmised by Sgt. Wode, his efforts

to swallow the baggie.  (Exhibit 1.)

Upon release from the emergency room, Demby was taken to the police station and read

his "Miranda" rights.  (Exhibit 1.)  When Sgt. Wode asked Demby what was in the baggie, he

said that it was empty.  He continued that he swallowed it because he did not want it to appear

that "it was drugs like the last time".  (Exhibit 1.)  When asked about his license being

suspended, Demby said that, because he had moved, he did not get the notice from the Motor

Vehicle Administration ("MVA").  (Exhibit 1.)  He also admitted that he had failed to inform the

MVA of his change of address.  (Exhibit 1.)  Sgt. Wode told him that he should do so in the near

future.  (Exhibit 1.)

As a result of the occurrence, Demby's car was impounded and searched.  (Exhibits 1, 6 and 7.)  During the search, Officer Yiannakis found a clear plastic baggie containing several pills on the front passenger's floorboard.  (Exhibits 1, 6 and 7.)  The white pill was "Zoloft"; the four red pills were undetermined.  (Exhibits 1, 6 and 7.)  In addition to the baggie, two Depakote tablets were found in the same area of the floorboard.  (Exhibits 1, 6 and 7.)  All of the evidence was turned over to Sgt. Wode.  (Exhibits 1 and 5.)

Demby was processed and charged with a number of offenses, specifically resisting arrest, driving with a suspended license, and displaying a suspended license.  (Exhibits 8 and 9.)  Subsequent to Demby's request for a trial by jury in the District Court of Maryland for Kent County, the charges were transferred to the circuit court.  There, on January 11, 2002, all charges were entered *nolle prosequi*.

**IV.    Argument**

**A.    42 U.S.C § 1983**

**1.    Personal Capacity Claims**

**a.  Fourth Amendment Unlawful Seizure Claims**

**(1)    The Existence of Probable Cause**

Concerning probable cause, the sole issue before the Court is "whether an objective law enforcement officer could reasonably have believed probable cause to exist."  *Gomez v. Atkins*, 296 F.3d 253, 260 (4th Cir.), *cert. denied*, 123 S. Ct. 964 (2003); *see also Smith v. Reddy*, 101 F.3d 351 (4th Cir. 1996); *S.P. v. City of Takoma Park*, 134 F.3d 260 (4th Cir. 1998); *Torchinsky v. Siwinski*, 942 F.2d 257, 260 (4th Cir. 1991).  "Wisely, the determination of probable cause is a 'practical, nontechnical conception,' and it involves 'factual and practical considerations of

everyday life on which reasonable and prudent men, not legal technicians act.'" *Gomez*, 296

F.3d at 262 (quoting *Brinegar v. United States*, 388 U.S. 160, 175-76 (1949)).

The "totality of the circumstances" here makes any assertion that the officers lacked probable

cause to effect an arrest "ring especially hollow." *Myers v. Shaver*, No. 7:02CV00654, 2003 WL

402844, *5 (W.D. Va. Feb. 21, 2003). The facts and circumstances in this case demonstrate that far

more than "mere suspicion" was raised. *Taylor v. Waters*, 81 F.3d 429, 434 (4th Cir. 1996) (citing

*Wong Sun v. United States*, 371 U.S. 471, 479 (1963)). To the contrary, the facts and circumstances

demonstrate conclusively that the officers had abundant probable cause to arrest based solely upon

Demby's driving without a valid license, not to mention his resisting arrest. Simply stated, these

undisputed facts, which include confirmation prior to the traffic stop that Demby was driving on a

suspended license, Demby's ingestion of suspected contraband during the stop, and his physical

resistance to the officers' efforts to recover the contraband and effect his arrest, unequivocally establish

the existence of probable cause upon which to effect an arrest. For these reasons, this aspect of

Demby's § 1983 claim must fail.

### (2)    Objective Reasonableness of the Force Used

The current constitutional standard for use of excessive force during arrest has been in

place since the 1989 decision in *Graham v. Connor*, 490 U.S. 386 (1989). Since *Graham*, the

question of whether an officer used excessive non-deadly force during an arrest has been

governed by the "objective reasonableness" standard of the Fourth Amendment. The objective

reasonableness standard is not capable of "precise definition or mechanical application." 490

U.S. at 396. Rather, the court must consider all of the facts and circumstances of each case,

including the severity of the crime occasioning the arrest, whether the suspect posed an

immediate threat to the safety of the officer or of anyone else, and whether he actively resisted or attempted to flee.  *Id.*  While the court should avoid reliance upon hindsight and should take into account the officer's need to make split-second judgments at the time he acted, the test is, in the end, still the objective reasonableness of his conduct.  *Id.* at 388, 396.

When a plaintiff claims that an officer used excessive force, the heightened pleading standard demands that he make "nonconclusory allegations of evidence" sufficient to demonstrate that the force used actually was unreasonable.  *See Hobson v. Wilson*, 737 F.2d 1, 29 (D.C. Cir. 1984).  A bare assertion that force was used is insufficient, as is a conclusory description of that force as "excessive."  Defendants note only that in drafting a complaint, counsel may consider, in addition to the factors mentioned by the Supreme Court in *Graham*, those itemized by the Fifth Circuit in *Brown v. Glossip*, 878 F.2d 871, 874 (5th Cir. 1989) (whether officer harbored ill-will toward the plaintiff, whether a warrant was used, whether the plaintiff resisted arrest or was armed, whether more than one arrestee or officer was involved, whether the plaintiff was sober, whether other dangerous or exigent circumstances existed at the time of the arrest, and what the arrest charges were).

Here, considering all of the facts and circumstances of this case, the minimal force applied by the arresting officers, which consisted solely of physical force intended to retrieve the suspected contraband unexpectedly ingested by Demby during the traffic stop, and then to terminate his resistance, was more than reasonable.  For despite continued resistance, the officers never drew their weapons, never struck Demby with a weapon, and never kicked Demby or struck him with fists.  The minimal force utilized is borne out by the fact that Demby sustained only minor, superficial scrapes as a result of the occurrence.

Application of the factors identified in *Graham* corroborates the conclusion that the force used was objectively reasonable. For when the factors are applied, they demonstrate that the circumstances confronting the officers included Demby's sudden concealment of potential evidence and his sustained resistance against every effort made by the officers to recover such evidence.

Viewing this evidence in full context establishes the "proportionality of the force in light of all the circumstances." *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994). Given Demby's conduct, "a reasonable officer on the scene" unquestionably would have perceived that Demby posed an "immediate threat to the safety" of the officers, justifying the force applied. *See Graham*, 490 U.S. at 396. In light of all of these factors, including the absence of any severe injury sustained by Demby, *see Saucier v. Katz*, 533 U.S. 194, 209 (2001) ("Our conclusion is confirmed by the uncontested fact that the force was not so excessive that respondent suffered hurt or injury."), the force used in this instance was not only reasonable, it was necessary.

### (3)     Qualified Immunity

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court held that in a Fourth Amendment excessive force case, the qualified immunity issue and the constitutional violation issue are not so intertwined that they "should be treated as one question, to be decided by the trier of fact." 533 U.S. at 199. The Court determined that the analysis set out in *Anderson v. Creighton*, 483 U.S. 635 (1987), is not affected by the Court's decision in *Graham v. Connor*, and that "[t]he inquiries for qualified immunity and excessive force remain distinct, even after *Graham*." 533 U.S. at 206. As stated above, *Graham* protects those officers who reasonably, but mistakenly believe the circumstances justified using more force than in fact was needed.

"The qualified immunity inquiry, on the other hand, has a further dimension.  The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct."  *Id.*

In light of *Saucier*, the Fourth Circuit recently stated that, in excessive force cases, entitlement to qualified immunity must be analyzed in two steps, which are to be "considered in proper sequence."  *Jones v. Buchanan*, 325 F.3d 520, 526 (4th Cir. 2003) (quoting *Saucier*, 533 U.S. at 200).  *See also Clem v. County of Fairfax*, 150 F. Supp. 2d 888, 893, 894 & nn.15, 16 (E.D. Va. 2001).  The "threshold question" requires a court to resolve the issue whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show [that] the officer's conduct violated a constitutional right."  *Saucier*, 533 U.S. at 201.  "If no constitutional right would have been violated," even when the facts are viewed in the best light for the injured plaintiff, the analysis ends; the plaintiff cannot prevail.  *Id.*  However, if, taking the allegations or evidence (depending on the procedural posture of the case) in the best light for the plaintiff, the plaintiff has stated a violation of a constitutional right, the court proceeds to the second step. "[T]he next, sequential step is to ask whether the right was clearly established" at the time of the events at issue.  *Id.*  If not, the qualified immunity doctrine still provides a defendant officer with immunity from suit.  If so, summary judgment must be denied.

Here, it is unquestioned that, by the decision in *Graham v. Connor*, it was clearly established in August 2001 that all claims of excessive force in the course of any seizure of a free person were to be analyzed under an "objective reasonableness" standard, taking into account the factors discussed above.  *Graham*, 490 U.S. at 395-96.  What also is unquestionably demonstrated in the summary judgment record, however, is that the officers utilized only

reasonable force under the circumstances, and not force that was unnecessary, gratuitous, and disproportionate. Therefore, the officers are entitled to qualified immunity as a matter of law.

## 2. Derivative Liability Claims Under § 1983

Here, the absence of an underlying constitutional violation extinguishes any § 1983 claim against the employing governmental entity as a matter of law. *See City of Los Angeles v. Heller*, 475 U.S. 796 (1986); *Young v. City of Mt. Rainier*, 238 F.3d 567, 579 (4th Cir. 2001) ("The law is quite clear in this circuit that a section 1983 failure-to-train claim cannot be maintained against a governmental employer in a case where there is no underlying constitutional violation by the employee"); *S.P. v. City of Takoma Park*, 134 F.3d 260, 272, 274 (4th Cir. 1998) ("Even assuming for the purposes of summary judgment that the training of its officers was unconstitutional, Takoma Park cannot be held liable when, as here, no constitutional violation occurred because the officers had probable cause to detain Peller.").

Further deficiency is found in the fact that Demby has sued Kent County, Maryland, for constitutional violations allegedly committed by officers alleged to be, at all relevant times, employees "of the City of Chestertown acting within the scope of [their] employment as . . . Chestertown Police Officer[s]." Amended Complaint ¶¶ 5 and 6. Obviously, Kent County bears no responsibility, or liability, under § 1983 for the alleged acts or omissions of police officers employed by, and acting for, a separate governmental entity.

Finally, in Count IX (Violation of Civil Rights (§ 1983)), Demby fails to allege that any local government caused any constitutional deprivation "through an official policy or custom." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). The absence of such allegation concerning governmental policy, practice or custom, is fatal to this aspect of Demby's claim.

### B.    Supplemental Claims

The Court may decline to exercise its discretionary supplemental jurisdiction set forth in 28 U.S.C. § 1367(a) over Demby's numerous state law claims.  "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a) (2001).  While the Court appears to have supplemental jurisdiction over the state law claims in this case, Congress has provided district courts with several discretionary exceptions to their exercise of supplemental jurisdiction in 28 U.S.C. § 1367(c)--one of which is pertinent here.  District courts may decline supplemental jurisdiction where "the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3); *see also Hardy v. Birmingham Bd. of Educ.*, 954 F.2d 1546, 1550 (11th Cir. 1992) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.  Certainly if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966))); *Campbell v. Masten*, 955 F. Supp. 526, 530 (D. Md. 1997).

However, based upon Demby's inordinate delay in serving Defendants, and in consideration of Defendants' request for summary judgment as an alternative form of relief, the Court may determine that the interests of all parties would be unduly prejudiced by dismissal of the state claims, and determine whether they survive summary judgment.  If the Court exercises jurisdiction over these claims, numerous defenses, including, but not limited to, limitations,

failure to allege or comply with condition precedent, governmental immunity, and public official immunity, serve to defeat them.

> **1.    Plaintiff's Failure to Allege Compliance With the Mandatory Notice Provision of the Local Government Tort Claims Act.**

Section 5-304(a) of the Local Government Tort Claims Act, Md. Code Ann., Cts. & Jud. Proc. §§ 5-301 through 5-304 (1998 repl. vol., 1999 Supp.) ("LGTCA"), states, in pertinent part, that "an action for unliquidated damages may not be brought against a local government *or its employees* . . . unless the notice of claim required by this section is given within 180 days after the injury." (Emphasis added.) In Kent County and the Town of Chestertown, the notice is to "be given in person or by certified mail, return receipt requested, . . . by the claimant or the representative of the claimant, to the county commissioner, county council, or corporate authorities of a defendant local government . . .." *Id.* § 5-304(b)(1).

In construing the predecessors of § 5-304, Maryland's appellate courts have regarded the notice provision as creating a condition precedent to the right to maintain an action for damages, and have required that compliance with the condition "be alleged in the [complaint] as a substantive element of the cause of action." *Madore v. Baltimore County*, 34 Md. App. 340, 342 (1976); *Grubbs v. Prince George's County*, 267 Md. 318, 320-21 (1972); *Neuenschwander v. Washington Sanitation Comm'n*, 187 Md. 67, 81 (1946); *Williams v. Montgomery County*, 123 Md. App. 119 (1998), *aff'd sub nom. Williams v. Maynard*, 359 Md. 379 (2000).

In both his original and amended Complaints, Demby failed to allege compliance with the notice requirement of the LGTCA. This pleading failure alone is sufficient to dismiss all supplemental claims.

### 2.    Governmental Immunity

It has long been recognized that the doctrine of sovereign or governmental immunity protects the State of Maryland from suit unless the immunity has been waived by the General Assembly.  *See Maryland-National Capital Park & Planning Comm'n v. Kranz*, 308 Md. 618, 622 (1987), and the cases cited therein.  Counties and municipalities, on the other hand, have not been accorded this broad general immunity from suit.  *Id.*  It is true that they are instrumentalities of the State, created by the State to carry out some of the State's governmental functions.  Nevertheless, under Maryland law, they consistently have been treated differently from State agencies and the State itself for purposes of immunity from suit.  Their immunity "is limited to tortious conduct."  *Austin v. Mayor & City Council of Baltimore*, 286 Md. 51, 53 (1979).

With regard to ordinary tort actions, counties and municipalities can rely on the defense of governmental immunity only when they exercise a function categorized as "governmental" rather than "proprietary" or "corporate."  *See, e.g., Maryland-National Capital Park & Planning Comm'n*, 308 Md. at 622, and cases cited therein; *Godwin v. County Comm'rs*, 256 Md. 326, 334-35 (1970); *Baltimore v. State*, 173 Md. 267, 271-72 (1937).

While the governmental immunity of counties and municipalities is much narrower than the immunity of the State, the immunity of counties and municipalities nevertheless is derived from the State's sovereign immunity.  *See Bradshaw v. Prince George's County*, 284 Md. 294, 299-300 (1979); *Godwin*, 256 Md. at 334-35; *Cox v. Anne Arundel County*, 181 Md. 428, 431 (1943) ("When the State gives a city or county part of its . . . power to exercise, the city or county to that extent is the State.").

In response to the state law claims against them, the County and Town assert the defense of governmental immunity.  In this case, the liability asserted against both governmental entities clearly arises out of a governmental function, specifically acts allegedly performed in connection with the operation of a municipal police department.  The principle has been stated thus:

> For those jurisdictions subscribing to the dichotomy between governmental and proprietary functions it is firmly established that the operation of a police department is a governmental function, and that the acts or omissions in connection therewith ordinarily do not give rise to liability on the part of the municipality.

*McQuillin Mun. Corp*. § 53.51 (3d ed.).

This principle has long been recognized in Maryland.  In *Wynkoop v. Hagerstown*, 159 Md. 194 (1930), the Court of Appeals recognized that:

> [t]he protection of the citizen against pestilence, disease, violence, or disorder, is essentially a governmental function to be exercised by the state under its police power, through proper agents.  And while in many cases it is difficult on the facts to mark the boundary between acts and duties which are in their essence governmental, and those which are of a corporate or municipal nature, that doubt does not exist in respect to the duties of agencies charged with the administration of the criminal laws, the conservation of the public peace, or the protection of the citizen from violence.  But the acts of such agencies done in the performance of duties imposed upon them by law are almost everywhere regarded as governmental in their nature, and for the benefit of the entire public.

*Id.* at 201.  *See also Quecedo v. Montgomery County*, 264 Md. 590 (1972).

Since Demby's claims against the County and Town arose from the performance of a function inherently governmental, both local governments are immune from liability.

### 3.    Public Official Immunity

The allegations of the pleadings, standing alone are insufficient to state any claim against the officers in their capacities as police officers.  As municipal police officers, Officers Wode and Yiannakis are statutorily immune as an official or individual from any civil liability if they

acted "in a discretionary capacity, without malice, and within the scope of the [their] employment or authority."  Md. Code Ann., Cts. & Jud Proc., § 5-507(b)(1) (2002 repl. vol.).

In either form, common law or statutory, Maryland's "[p]ublic official immunity is qualified, not absolute." *Nelson v. Kenny*, 121 Md. App. 482, 487 (1998).  "It may be defeated by proof of malice, *i.e.* affirmative evidence that the official 'intentionally performed an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and wilfully injure the plaintiff.'" *Id.* (quoting *Davis v. DiPino*, 99 Md. App. 282, 290 (1994), *rev'd on other grounds*, 337 Md. 642 (1995), *aff'd in part, vacated in part*, 354 Md. 18 (1999)).

The actual malice needed to defeat statutory public official immunity requires an "act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and wilfully injure the plaintiff." *Lovelace v. Anderson*, 126 Md. App. 667, 694, *rev'd on other grounds,* 366 Md. 690 (2001).  *See also Branch v. McGeeney*, 123 Md. App. 330, 349 (1998); *Thomas v. City of Annapolis*, 113 Md. App. 440, 454-57 (1997); *Williams v. Prince George's County*, 112 Md. App. 526, 550-51 (1996); *Davis*, 99 Md. App. at 290-91; *Arrington v. Moore*, 31 Md. App. 448, 464 (1976).

Here, the boilerplate allegations of the original and amended Complaints are insufficient to reach the extreme level of actual malice.  In other words, the allegations are insufficient to raise even the issue of whether the officer's actions were "without legal justification or excuse," or that they were motivated by an evil or rancorous motive influenced by hate."  Accordingly, the Defendant officers are immune from liability.

### 4.        False Imprisonment

In order to prevail on a claim for false arrest, "the plaintiff must prove that the defendant deprived him or her of his or her liberty without consent and without legal justification." *Scott v. Jenkins*, 345 Md. 21, 29 (1997). *See also Ashton v. Brown*, 339 Md. 70, 119 (1995); *Montgomery Ward v. Wilson*, 339 Md. 701, 721 (1995); *Fine v. Kolodny*, 263 Md. 647, 651 (1971); *Fleisher v. Ensminger*, 140 Md. 604, 620 (1922); *Lewin v. Uzuber*, 65 Md. 341, 348-49 (1886); *Mitchell v. Lemon*, 34 Md. 176, 180 (1871). "The elements of false imprisonment are the same as the elements for false arrest." *Davis v. DiPino*, 121 Md. App. 28, 38 (1998), *aff'd in part, vacated in part on other grounds*, 354 Md. 18 (1999). "Legal justification" was defined by the Court of Appeals in *Great Atl. & Pac. Tea Co. v. Paul*, 256 Md. 643 (1970). The Court explained:

> When the cases speak of legal justification we read this as equivalent to legal authority . . .. Whatever technical distinction there may be between an "arrest" and a "detention" the test whether legal justification existed in a particular case has been judged by the principles applicable to the law of arrest.

*Id.* at 655 (internal citations omitted).

With regard to an arrest by a police officer, the officer's liability "will ordinarily depend upon whether or not the officer acted within his legal authority to arrest." *Montgomery Ward*, 339 Md. at 721. Consequently, "[a]n arrest made under a warrant which appears on its face to be legal is legally justified in Maryland, even if unbeknownst to the arresting police officer, the warrant is in fact improper." *Ashton*, 339 Md. at 120.

In *Ashton*, 339 Md. 70, the Court explored the relationship between "probable cause" and "legal justification", stating:

> [W]hile the presence or absence of probable cause to believe that a crime was committed may be pertinent in some cases with regard to the lawfulness of the arrest, the actual element of the tort of false imprisonment is legal justification rather than probable cause. To the extent that the lawfulness of an arrest does not turn upon probable cause under Maryland law, probable cause will not be determinative of the legal justification issue in a false imprisonment action based on that arrest.

*Id.* at 120. *See, e.g., Dorsey v. Winters*, 143 Md. 399 (1923) (granting a new trial in part because the court employed a probable cause standard rather than a legal justification standard in its instruction on false imprisonment). The *Ashton* Court noted, for example, "probable cause is not a defense in an action for false imprisonment based upon a police officer's warrantless arrest for the commission of a non-felony offense, or upon an arrest by a private person." *Id.* at 121 (emphasis added). Although probable cause may be "considered for the purpose of mitigation of damages," *Clark's Brooklyn Park, Inc. v. Hranicka*, 246 Md. 178, 186 (1967), legal justification is the pertinent inquiry when considering the merits of a false imprisonment claim. *Ashton*, 339 Md. at 121. *See also Safeway Stores, Inc. v. Barrack*, 210 Md. 168, 173-74 (1956); *Laws v. Thompson*, 78 Md. App. 665, 686 (1989). Consequently, to render a decision on Demby's claim, the Court must assess the officers legal authority to arrest Demby under Maryland law, rather than considering the manner in which the arrest was effected. Likewise, the Court must consider whether Demby was arrested in accordance with Maryland law.

A Maryland police officer has legal justification to arrest without a warrant when, inter alia, he has probable cause to believe that the arrestee has committed or attempted to commit a felony, or that the arrestee has committed or attempted to commit a misdemeanor in his presence. *See generally* Maryland Ann. Criminal Procedure Code (2001), § 2-201. Probable cause to arrest exists if, at the moment of the arrest, the facts and circumstances within the relevant

actor's knowledge and of which he had reasonably reliable information were adequate to warrant a prudent person in believing that the object of his suspicions had perpetrated or was poised to perpetrate an offense. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964); *United States v. Figueroa*, 818 F.2d 1020, 1023 (1st Cir. 1987). By definition, the determination does not require scientific certainty. *See Illinois v. Gates*, 462 U.S. 213, 235 (1983).

The inquiry into the existence *vel non* of probable cause is not to be undertaken from the perspective of hindsight but from the perspective of a hypothetical "reasonable man" standing in the reporting person's shoes at the time when that person acted. *See Figueroa*, 818 F.2d at 1023; *United States v. McCambridge*, 551 F.2d 865, 870 (1st Cir. 1977). The preferred approach is pragmatic; it focuses on the "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Gates*, 462 U.S. at 231. Thus, the quantity and quality of proof necessary to ground a showing of probable cause is not the same as the quantity and quality of proof necessary to convict. *See United States v. Hoffman*, 832 F.2d 1299, 1305-06 (1st Cir. 1978). It follows that one who asserts the existence of probable cause is not a guarantor either of the accuracy of the information upon which he has reasonably relied or of the ultimate conclusion that he reasonably drew therefrom. *See Figueroa*, 818 F.2d at 1024-25.

The probable cause in the instant case which led to Demby's being taken into custody was set forth in the Application for Statement of Charges prepared by Officer Wode. His observations, as recorded in this document, provided more than sufficient probable cause for the officers to act as they did. Simply stated, the officers had probable cause to arrest Demby without a warrant on August 30, 2001**,** when, in the performance of their lawful duties, they

determined that he was driving a vehicle while his license was suspended, that Demby ingested

suspected contraband during the course of a valid traffic stop, and that Demby physically resisted

all efforts to recover the suspected contraband, and to effect his arrest. These acts were

committed upon and/or in the officers' presence, and, as a result, Demby was physically

restrained and taken into custody. Thus, any assertion that the officers' actions lacked legitimacy

or sound probable cause is unfounded.

### 5.    Malicious Prosecution

Defendants also move for summary judgment on Demby's state law claim of malicious

prosecution. The common law elements of malicious prosecution are: (1) a criminal proceeding

instituted or continued by the defendant against the plaintiff; (2) termination of the proceeding in

favor of the accused; (3) absence of probable cause for the proceeding; and (4) "malice" or a

primary purpose in instituting the proceeding other than that of bringing an offender to justice.

*Exxon Corp. v. Kelly*, 281 Md. 689, 693 (1978). Without addressing the other elements of the

claim, it has already been established that probable cause was not absent from the proceedings

against Demby. Accordingly, summary judgment is appropriate with regard to the common law

claim as well.

### 6.    Intentional Infliction of Emotional Distress

To sustain a claim for intentional infliction of emotional distress, a plaintiff must

establish that: (1) the defendant's conduct was intentional or reckless; (2) his conduct was

extreme and outrageous; (3) there was a causal connection between the defendant's wrongful

conduct and the emotional distress suffered; and (4) the emotional distress was severe. *Harris v.*

*Jones*, 281 Md. 560, 566 (1977).  In this case, the allegations of the original or amended

Complaints fail to satisfy the requirements of Maryland law.

In order to meet the requirements of the tort, specifically to establish that the conduct was

extreme and outrageous, the defendant's conduct must have been so outrageous that it goes

"beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in

a civilized community."  *Continental Cas. Co. v. Mirabile*, 52 Md. App. 387, 403 (1982)

(quoting Restatement (Second) of Torts 19 § 46, comment d (1965)).  Here, using only factually

unsupported hyperbole, Demby alleges a mundane claim of police misconduct.  Such complaints

are all too common in both federal and state courts, and the instant pleadings fail to set forth any

allegations separating them from the rest.  Accordingly, Demby's claims, largely consisting of

assault and battery, false imprisonment, malicious prosecution, and defamation, cannot be

viewed as alleging conduct "utterly intolerable in a civilized community."

Further, the fourth element of the test has been interpreted to "require[ ] the plaintiff to

show that he suffered a severely disabling emotional response to the defendant's conduct."

*Harris*, 281 Md. at 570.  "The law intervenes only where the distress inflicted is so severe that no

reasonable man could be expected to endure it."  *Id.* at 571 (quoting Restatement (Second) of

Torts § 46 comment j (1965)).  In *Reagan v. Rider*, 70 Md. App. 503 (1987), the Maryland Court

of Special Appeals acknowledged that "something less than complete emotional disablement

would be sufficient to satisfy the severe emotional distress element."  *Id.* at 511.  The severity is

measured "by factors including the intensity of the response as well as its duration."  *Moniodis v.

Cook*, 64 Md. App. 1, 15 (1985).  Thus, an action for intentional infliction of emotional distress

may be sustained only if one can no longer function, *see Vance v. Vance*, 41 Md. App. 130, 136-

37, *aff'd in part, rev'd in part on other grounds,* 286 Md. 490 (1979), and can no longer tend to

necessary matters. *See Leese v. Baltimore County*, 64 Md. App. 442, 471-72 (1985). No such

allegations have been made in the instant pleadings.

### 7.    Defamation Per Se

According to the Amended Complaint, "Defendant Wode negligently implied and

directly stated through his conduct and words that the Plaintiff was resisting arrest and that

Plaintiff had possessed drugs on the date of this incident." Amended Complaint ¶ 34. For the

reasons set forth below, this claim is not only time-barred, it is substantively deficient.

For defamation, the governing statute of limitations in Maryland is one year from the date

of accrual. Md. Ann. Courts & Judicial Proceedings Code (2002), § 5-105. As such, Demby's

defamation claim, accruing in August 2001, when the allegedly defamatory statements were

communicated by Officer Wode, but not filed until February 2003, is time-barred.

Even if the claim were not time-barred, it still would not survive. In a defamation case

involving a plaintiff who is not a public figure, a prima facie case requires proof of the following

elements:

> (1) that the defendant made a defamatory communication--i.e., that he
> communicated a statement tending to expose the plaintiff to public scorn, hatred,
> contempt, or ridicule to a third person who reasonably recognized the statement as
> being defamatory;
> (2) that the statement was false;
> (3) that the defendant was at fault in communicating the statement; and
> (4) that the plaintiff suffered harm.

*Bagwell v. Peninsula Medical Center*, 106 Md. App. 470, 510-11 (1995); *Kairys v. Douglas*

*Stereo, Inc.*, 83 Md. App. 667, 678 (1990) (citing *Hearst Corp. v. Hughes*, 297 Md. 112 (1983)

and *Gooch v. Maryland Mech. Sys., Inc.*, 81 Md. App. 376 (1990)). "Fault", for the purposes of

the prima facie case, may be based either on negligence or constitutional malice. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964); *Batson v. Shiflett*, 325 Md. 684, 728 (1992); *Hearst Corp.*, 297 at 122 (citing *Jacron Sales Co. v. Sindorf*, 276 Md. 580 (1976)). *See also* RESTATEMENT (2D) TORTS § 580B (1975) (fault standard for defamation of a private person).

Here, the videotape of the incident establishes that Officer Wode communicated nothing defamatory to any third person during, or subsequent to, the traffic stop and arrest.

### 8.  Assault and Battery

In Maryland, "[a] civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced." Md. Ann Courts & Judicial Proceedings Code (2002), § 5-101. For assault, libel, and slander actions, another provision governs. Section 5-105 states that "[a]n action for assault, libel, or slander shall be filed within one year from the date it accrues." In the instant case, the alleged assault was committed on August 30, 2001. Thus, Demby had until August 30, 2002, to initiate an assault action against Defendants. He failed to do so. Since suit was not filed until February 2003, Demby's assault claim is time-barred.

### 9.  Negligent Supervision

The local governments sued in this action are also entitled to governmental immunity against Demby's claims of negligent supervision. *See, e.g., Vincent v. Prince George's County*, 157 F. Supp. 2d 588, 594 (D. Md. 2001) ("Plaintiff agrees that summary judgment is proper as to his claims against the County for battery and negligent hiring, retention, and supervision."); and *Lanford v. Prince George's County*, 199 F. Supp. 2d 297, 302 (D. Md. 2002) ("Proposed Count XIV against the County and Cheverly for negligent hiring, training and retention similarly fails.

The employment and supervision of police officers is a governmental function, and not

proprietary or corporate.  As such, governmental immunity protects the county from liability in

tort for simple negligence.").  *See also Housing Authority of Baltimore City v. Bennett*, 359 Md.

356, 359 (2000).

.                   **10.    State Constitutional Claims**

The same undisputed material facts that prove fatal to Demby's federal constitutional

claims prove equally fatal to his claims under Articles 24 and 26 of Maryland's Declaration of

Rights.  As pointed out by Judge Smalkin in *Green v. Zendrian*, 916 F. Supp. 493, 497 (D. Md.

1996), numerous Maryland decisions interpreting the Declaration of Rights, specifically Article

26, have held that its Articles are to be construed *in pari materia* with its federal counterpart, the

Fourth Amendment to the United States Constitution.  *See, e.g., Gahan v. State*, 290 Md. 310

(1981); *Liichow v. State*, 288 Md. 502, 509 n.1 (1980) ("Article 26 is generally in pari materia

with the Fourth Amendment and similarly prohibits unreasonable searches and seizures");

*Merrick v. State*, 283 Md. 1, 4 n.2 (1978); *Givner v. State*, 210 Md. 484 (1956); *Blum v. State*, 94

Md. 375 (1902).

Ordinarily, to the extent that a provision of the Maryland constitution is held to be *in pari

materia* with a federal counterpart, the two constitutional provisions are applied "'in like manner

and to the same extent,'" and "'decisions of the Supreme Court on the [federal provision] are

practically direct authorities'" for interpreting the Maryland provision.  *Attorney Gen. of Md. v.

Waldron*, 289 Md. 683, 704-05 (1981) (quoting *United States Mortgage Co. v. Matthews*, 167

Md. 383, 395, *rev'd on other grounds*, 293 U.S. 232 (1934), and *Bureau of Mines v. George's

Creek*, 272 Md. 143, 156 (1974)).  Consequently, to the extent that the Supreme Court's

interpretation of the First, Fourth, and Fourteenth Amendments is "practically direct" authority

with respect to a Maryland court's interpretation, Demby's state constitutional claims must fail.

### C.     Lack of Legal Identity

In the discharge of a duty primarily resting upon the municipality, generally the rule is

that a department acts as its agent although the department may have full power in the particular

matter involved. *McQuillin Mun. Corp.* § 12.40 (3d. ed., 1990 rev. vol.). And, if the department

is not a corporate body, it cannot be sued as such. *Id.* More specifically, "[w]here a police

department is an integral part of the [local] government as the vehicle through which the [local

government] fulfills its policing functions, it is not an entity subject to suit." *Eddy v. City of

Miami*, 715 F. Supp. 1553, 1556 (S.D. Fla. 1989) (citing *Vinson v. Richmond Police Dep't*, 567

F.2d 263 (4th Cir. 1977)); *Shelby v. City of Atlanta*, 578 F. Supp. 1368 (N.D. Ga. 1984).

The instant pleading fails to allege that the Chestertown Police Department is a corporate

body separate and apart from the Town itself. Even if such allegation were made, it would be

untrue. The City Charter does not establish the police department as an agency vested with the

ability to sue or be sued in its own name. Instead, pursuant to the Charter, it is only the Town

itself that can sue or be sued. Lacking any legal identity apart from the local government

creating it, the Town of Chestertown Police Department must be dismissed as a party to this

action.

### D.     Punitive Damages

Demby's claims for punitive damages against the Defendants are unsupported in federal

or state law. Under § 1983, punitive damages are not recoverable against municipalities or other

local governments. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981). Accordingly,

this aspect of Demby's Complaint, as amended, must be dismissed.  Further, in the absence of statutory authority exemplary or punitive damages may not be recovered against a state or a local government.  *See* Md. Code Ann., Cts. & Jud. Proc. § 5-522(a) (1998 repl. vol., 2000 Supp.) ("Immunity of the State is not waived under . . . the State Government Article for: (1) Punitive damages . . .."); *Id.* § 5-303(c) ("A local government may not be liable for punitive damages."); *Herilla v. Mayor and City Council of Baltimore*, 37 Md. App. 481 (1977).  Since there is no such statutory authority in Maryland, Demby's punitive damage claims against Kent County and the Town of Chestertown must be dismissed.

Concerning the claims against the officers in their personal capacities, not only are the allegations of the original or amended Complaints insufficient to raise the specter of actual malice, the summary judgment record establishes the virtual absence of malice on the part of Officers Wode and Yiannakis**.**  Accordingly, the punitive damages claims against these Defendants in their personal capacities similarly must be dismissed.

**V.      Conclusion**

For these reasons, Defendants' Motion to Dismiss, or, Alternatively, for Summary Judgment, must be granted.

_____/s/_____
John F. Breads, Jr.
(01343)

28

_____/s/_____
Christine T. Altemus
(10218)
7172 Columbia Gateway Drive
Suite E
Columbia, Maryland 21046
(410) 312-0880

Attorneys for Defendants Kent County,
Maryland, Chestertown, Maryland, the
Chestertown Police Department, and
Sergeant C.F. Wode and Officer Jason
Yiannakis

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 4th day of August, 2003, a copy of the aforegoing

Memorandum in Support of Defendants' Motion to Dismiss, or, Alternatively, for Summary

Judgment, was served via electronic filing system, as possible, and was mailed, via first-class

mail, postage prepaid, to James L. Rhodes, Esquire, 10 North Calvert Street, Suite 204,

Baltimore, Maryland 21202.

_____/s/_____
John F. Breads, Jr.